# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAIME PAGAN, ARIEL RUANO, and CHRIS SADOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JACK LU, ZHUOXUN YIN, SIDNEY ZHANG, ZHUOJIE ZHOU, EUCLID LABS, INC. d/b/a MAGIC EDEN, ME FOUNDATION, and DOES 1 THROUGH 50,<br><br>Defendants. | Case No. 1:26-cv-3608<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT                    3

II.   PARTIES                                  8

III.  JURISDICTION AND VENUE                   15

IV.   FACTUAL ALLEGATIONS                      17

V.    CLASS ALLEGATIONS                        42

VI.   CLAIMS FOR RELIEF                        44

VII.  PRAYER FOR RELIEF                        51

VIII. JURY DEMAND                              53

# I. PRELIMINARY STATEMENT

1. This case is about a company and its founders who promoted a digital token called $ME as a product with real use cases inside a growing Magic Eden ecosystem. A digital token is a tradable digital asset recorded on a blockchain, a shared, tamper-resistant ledger maintained by a decentralized network of computers. Consumers were not merely told that $ME was a token that might rise or fall in price. They were told why it would have value: it would be used across multiple blockchain networks, provide voting power over platform decisions, reward users who traded or locked their tokens, later be supported by revenue-allocation and buyback programs, and serve as the economic backbone of Magic Eden's expanding digital-asset platform.

2. Those promised functions, what crypto marketing materials called "utility", were the basis of the product's value. In ordinary terms, a token with real uses across a large platform is more valuable than a token with no meaningful use. Defendants' promotional campaign created the belief that $ME had, or imminently would have, those uses.

3. Defendants made those promises credible through multiple channels. Magic Eden was a venture-backed technology company that had raised approximately $157 million from institutional investors including Paradigm, Sequoia Capital, Electric Capital, Greylock, and Lightspeed Venture Partners at a $1.6 billion valuation. Its founders had backgrounds at prominent technology and crypto companies including FTX, Google, Coinbase, Facebook, and Uber. The ME Foundation published official token materials. Defendants appeared in media interviews, posted on social media, secured listings on major cryptocurrency exchanges, promoted staking and rewards programs, and represented that $ME would be tied to a growing multi-chain platform.

4. The alleged deception is that the use cases did not materialize as represented. The multi-chain marketplace strategy was abandoned in material part. Governance was delayed for approximately nine months. Broad revenue-sharing and staking-reward mechanisms were not implemented until 2026, and the November 2025 buyback program was later changed and discontinued in material part. Trading rewards were not delivered in the represented form. The wallet users were required to adopt for the airdrop was later shut down. The platform pivoted away from the represented multi-chain digital-asset ecosystem and toward Dicey, a crypto casino and sportsbook.

5. Consumers were harmed because they paid for, held, staked, or locked a digital asset whose value depended on represented use cases that were delayed, diminished, abandoned, contradicted, or never delivered as represented.

6. Euclid Labs, Inc. d/b/a Magic Eden is a Delaware corporation that operates a digital-asset marketplace, a platform where users buy and sell non-fungible tokens ("NFTs") and other digital assets. The company was founded in September 2021 by Defendants Jack Lu, Zhuoxun Yin, Sidney Zhang, and Zhuojie Zhou.

7. On December 10, 2024, Defendants launched the $ME token through a Token Generation Event ("TGE"), the moment a new digital token is created and first made available for distribution and trading. The Token was promoted as the official ecosystem token of a multi-chain NFT and digital-asset platform. "Multi-chain" means the product was represented as working across multiple independent blockchain networks, including Solana, Bitcoin, and Ethereum, rather than being limited to one.

8. The Token was promoted with specific represented use cases. These included: earning rewards by trading on the platform; voting on platform decisions through a governance system called the ME DAO; later participating in revenue-allocation and buyback programs; using $ME within Magic Eden marketplace activity; and participating in staking programs, "staking" meaning locking or committing tokens to receive rewards, voting power, or other benefits.

9. Holders of $ME received no equity in Magic Eden. They received no contractual revenue-sharing rights, no enforceable governance power, and no legal interest in any underlying enterprise.

10. Because $ME holders received no equity, no contractual revenue right, and no legal interest in Magic Eden, the token's market value depended primarily on whether the represented use cases would generate real user demand. Consumers were speculating on represented use, not merely gambling on a ticker symbol. The speculative component of $ME's price was use-case speculation, the expectation that if the promised features were delivered, real users would demand $ME for actual ecosystem use.

11. Among the most striking examples was the multi-chain use case. In October 2024, Lu and Magic Eden-affiliated public channels announced a broad all-assets, all-chains strategy, including support for ten chains and a unified app experience. The ME Foundation's website listed eight supported chains. On February 27, 2026, fourteen months after the token launch, Lu announced that Magic Eden would refocus on one blockchain, Solana, and sunset Bitcoin and EVM marketplace operations. Bitcoin, Ethereum, and other EVM marketplace operations were terminated. The multi-chain wallet was deprecated. The company pivoted to Dicey, a crypto casino and sportsbook.

12. The revenue-allocation use case is equally significant. In November 2025, Magic Eden announced that 30% of secondary marketplace revenue would fund buybacks, split 15% to $ME and 15% to NFTs, a mechanism through which the platform uses its own revenue to purchase tokens or NFTs on the open market, which Defendants represented would support the ecosystem. "Buybacks" is simply the use of platform revenue to purchase tokens or other digital assets from the market. A broader revenue-sharing and USDC staking-reward model was not announced until January 2026 and did not begin until February 1, 2026, nearly fourteen months after the Token launched.

13. When the broader revenue-sharing model was announced, Magic Eden's revenue had declined dramatically. On January 19, 2026, CEO Lu disclosed that the company generated approximately $24 million in revenue in 2025. The January 2026 model allocated 15% of total revenue to the $ME ecosystem, producing approximately $3.6 million annually if revenue remained at that level. Within weeks, however, Magic Eden announced a Solana-focused retrenchment, shut down Bitcoin and EVM marketplace operations, and discontinued NFT buybacks, narrowing the revenue base and undercutting the represented ecosystem-support mechanism.

14. The governance use case was equally hollow. The ME DAO, a decentralized autonomous organization, which is an online governance structure through which tokenholders were told they could vote on platform decisions, was promoted as giving $ME stakers voting power over protocol development and key platform directions. Governance voting was not operational for approximately nine months after the Token launched.

15. The airdrop claiming process itself was designed to funnel users into Magic Eden's proprietary wallet application. An "airdrop" is a promotional token distribution, similar to a rewards distribution, sent to users as compensation for prior platform activity. A "wallet" is software that lets users access and control digital assets. CoinDesk documented that the wallet stored recovery phrases and private keys, the password-like credentials that control access to a user's digital assets, with no deletion route. This critical security deficiency was never disclosed to users before they imported their credentials.

16. The Token reached an all-time high of approximately $5.63 on December 11, 2024, excluding a brief launch-day price spike on thin liquidity. It has since declined approximately 98%, to approximately $0.12.

17. Consumers who acquired or held $ME in reliance on the represented use cases suffered three categories of harm: (a) overpayment at the point of purchase based on inflated expectations of use-case-driven demand; (b) holding-period losses from retaining or staking tokens based on continuing representations about use cases that were delayed, diminished, or abandoned; and (c) restitutionary injury from conferring economic benefits on Defendants, platform adoption, trading liquidity, wallet downloads, data, who failed to deliver the represented product.

18. Plaintiffs bring this class action on behalf of a nationwide class of all persons and entities in the United States who purchased or otherwise acquired $ME tokens for value during the Class Period.

19. The timing of Defendants' conduct is significant. In approximately November 2025, Magic Eden expanded to the Monad blockchain. On November 12, 2025, it announced a

buyback program with planned rollout to Bitcoin, Ethereum, and Monad. On January 19, 2026, it announced revenue sharing starting February 1, 2026.

20. In February 2026, Magic Eden announced that validator revenue, revenue generated by a system that helps process blockchain transactions and earns fees for doing so, would be used to buy back $ME for distribution to $ME stakers. Later that month, on February 27, 2026, Lu announced that Magic Eden would refocus on Solana and sunset Bitcoin and EVM marketplace operations.

21. Plaintiffs allege that commitments made in the preceding months were made while the strategic pivot was imminent or under active consideration. Consumers who locked tokens for extended staking periods based on these commitments were induced to do so under false pretenses.

22. This action does not assert any claim under federal or state securities law. It does not ask the Court to determine whether $ME is or is not a security. Plaintiffs' claims arise under New York consumer-protection law and common-law theories because Defendants allegedly misrepresented the product attributes and use cases that gave $ME its consumer and market value. Those claims are brought on behalf of a nationwide Class under New York General Business Law Sections 349 and 350 and common-law theories of negligent misrepresentation and unjust enrichment.

## II. PARTIES

*Plaintiffs*

23. Plaintiff Jaime Pagan ("Pagan") is an individual and a citizen of New York residing in New Windsor, New York. During the Class Period, while physically located in New York, Pagan saw Defendants' public marketing concerning $ME, including representations concerning cross-chain use cases, governance rights, revenue sharing, buybacks, staking rewards, Magic Eden's institutional credibility, and Magic Eden's New York-facing promotional activity. Pagan purchased or otherwise acquired $ME tokens for value from New York, staked $ME and ranked among the platform's top stakers, and suffered losses of approximately $2,000. On April 3, 2024, Pagan attended the invitation-only "Degen Yacht Party" hosted by Magic Eden aboard a yacht departing from Manhattan during the NFT.NYC conference, an event to which Magic Eden invited him based on his standing among the most active users of its platform, a cruise through the waters of New York Harbor.

24. Plaintiff Ariel Ruano ("Ruano") is an individual and a citizen of California residing in Sacramento, California. During the Class Period, Ruano saw the same standardized public marketing campaign concerning $ME through social media, public interviews, project-affiliated channels, official Magic Eden and ME Foundation materials, and cryptocurrency trading platforms. Ruano purchased or otherwise acquired $ME tokens for value and suffered losses of approximately $100.

25. Plaintiff Chris Sadowski ("Sadowski") is an individual and a citizen of Massachusetts residing in Danvers, Massachusetts. During the Class Period, Sadowski saw the same standardized public marketing campaign concerning $ME, purchased or otherwise acquired $ME tokens for value, and staked his tokens in reliance on Defendants' representations concerning staking rewards. Sadowski suffered losses of approximately $1,000.

26. Plaintiffs acquired, held, staked, or locked $ME in reliance on the appearance of cross-chain use cases, governance rights, revenue sharing, buybacks, staking rewards, and institutional credibility created by Defendants' promotional campaign. Plaintiffs bring this action individually and on behalf of all similarly situated persons and entities.

*Defendants*

27. Jack Lu ("Lu") is the CEO and co-founder of Magic Eden. Upon information and belief, Lu is an Australian national domiciled in Australia.

28. Lu was not merely a corporate executive overseeing a marketplace. He was the principal architect and public spokesperson for the $ME token launch, the multi-chain strategy, and every major strategic pivot that followed.

29. Lu promoted the $ME token to his tens of thousands of followers on X (formerly Twitter) and personally made the core representations that defined the Token's represented use cases.

30. Before founding Magic Eden, Lu held roles at FTX (partnerships and corporate development), Google (product), and Boston Consulting Group. In 2014 he joined HelloBlock, a developer API company for blockchain, as an early engineer. His professional background in token launches, exchange operations, and blockchain infrastructure gave him direct knowledge of the representations he made about the Token's use cases.

31. In October 2024, Lu and Magic Eden-affiliated public channels announced a broad all-assets, all-chains strategy, including support for ten chains and a unified app experience. On

February 27, 2026, Lu announced a contrary strategic direction: refocusing on Solana, sunsetting Bitcoin and EVM marketplace operations, and prioritizing Dicey.

32. On or about December 15, 2024, five days after launch, Lu stated in substance that he was returning to day one, continuing to build, and that the launch of the ME token was just the beginning with more planned. The Token had already begun its decline.

33. Lu's allocation within the 25.5% of $ME supply reserved for core contributors, and his equity interest in Magic Eden, a company valued at $1.6 billion, establish his direct financial interest in the Token's market performance.

34. On January 19, 2026, Lu disclosed that Magic Eden generated approximately $24 million in revenue in 2025. He simultaneously announced that 15% of platform revenue would flow to the $ME ecosystem. At that revenue level, this produced approximately $3.6 million annually if revenue remained at that level.

35. Lu appeared on multiple podcasts and media platforms including Bankless, Lightspeed (Solana Compass), and TechCrunch's Chain Reaction to promote $ME and the multi-chain narrative. Each appearance reinforced the use-case representations that were subsequently narrowed, delayed, or abandoned.

36. Zhuoxun Yin, also known as "Zedd" ("Yin"), is the co-founder and Chief Operating Officer of Magic Eden. Upon information and belief, Yin is an Australian national residing in the United States.

37. Yin was previously the second employee at dYdX, a decentralized exchange, and a Senior Product Manager at Coinbase. He also served as a Senior Associate Consultant at Bain &

Company. His prior experience at dYdX and Coinbase gave him specific expertise in token launch mechanics, tokenomics design, and exchange operations.

38. Yin made product announcements, cross-chain strategy updates, and public representations about the $ME ecosystem through his X account and media appearances. He appeared jointly with Lu on the Bankless podcast to announce the $ME token.

39. Sidney Zhang ("Zhang") is the CTO and co-founder of Magic Eden. Upon information and belief, Zhang is domiciled in San Francisco, California.

40. Zhang was previously an Engineering Manager at Facebook and a Staff Software Engineer at Uber, where he was a founding engineer of Uber Eats. He co-founded HelloBlock, a blockchain startup, in 2013.

41. Zhang was responsible for the technical architecture of the Magic Eden platform, including the wallet application through which $ME airdrop claims were processed. The wallet's documented security deficiencies, including non-standard recovery phrase implementation and private key backup practices, fell within Zhang's area of technical authority.

42. Zhuojie Zhou, also known as "Rex" ("Zhou"), is the Chief Engineer and co-founder of Magic Eden. Upon information and belief, Zhou is domiciled in San Francisco, California.

43. Zhou holds a Ph.D. in Computer Science from George Washington University and was previously a Staff Engineer at Facebook AI (PyTorch Developer Infrastructure) and an early engineer at Uber and Checkr. He is the creator of Flagr and OpenMock, open-source engineering tools.

44. Zhou's technical decisions regarding token infrastructure, smart contract deployment, and platform security architecture are directly relevant to the representations made about $ME's use cases and the wallet's security.

45. Euclid Labs, Inc. d/b/a Magic Eden ("Magic Eden") is a corporation organized under the laws of Delaware with its principal place of business at 332 Pine Street, Suite 800, San Francisco, California 94104.

46. Magic Eden is the principal corporate entity behind the Magic Eden NFT marketplace, cross-chain trading platform, and the $ME token ecosystem. The company raised approximately $157 million across two funding rounds from Paradigm, Sequoia Capital, Electric Capital, Greylock, and Lightspeed Venture Partners at a $1.6 billion valuation.

47. Magic Eden reported approximately $24 million in revenue in 2025, as disclosed by CEO Lu. The company developed and operated the proprietary mobile wallet application through which $ME airdrop claims were exclusively processed.

48. In September 2024, Magic Eden segregated U.S. users to a separate domain (magiceden.us) in an apparent preemptive regulatory compliance measure while continuing to operate from its San Francisco headquarters.

49. The ME Foundation ("Foundation") is, upon information and belief, a foundation company organized under the laws of the Cayman Islands. The Foundation's Director is Matt Szenics.

50. The ME Foundation was established as the formal issuer and governance steward of the $ME token. It controlled the token issuance mechanism, set the tokenomics, the token's

economic design: how many tokens exist, who receives them, when they can be sold, and what mechanisms may support demand, and vesting schedules, determined airdrop eligibility criteria, and published the official representations about $ME's use cases through its blog at blog.mefoundation.com and its X account @MEFndn.

51. The Foundation claims to operate independently from Magic Eden, but shares leadership personnel and coordinates promotional activity with the marketplace entity. The degree of actual independence between these entities is a key factual question.

52. The ME Foundation's tokenomics blog, published November 18, 2024, set the allocation structure, vesting schedules, and airdrop eligibility criteria that determined how $ME supply would be distributed. The Foundation controlled the airdrop claim portal through which 125 million tokens were distributed.

53. The Foundation's X account @MEFndn actively promoted the Token, confirmed buyback executions, and disseminated the governance, staking, and revenue-sharing representations at issue in this Complaint.

54. Does 1 through 50 are individuals and entities whose true names and capacities are unknown to Plaintiffs.

55. Upon information and belief, these Doe Defendants include individuals who participated in the development, marketing, and promotion of $ME, including engineers, marketing personnel, and business development staff who made consumer-facing representations about the Token's use cases.

56. They also include entities that received token allocations, strategic participant compensation, or other consideration in connection with the $ME promotional campaign, including the institutional investors who received the 23.6% strategic participant allocation.

57. Plaintiffs will seek leave to amend this Complaint when their identities are ascertained through discovery.

### III. JURISDICTION AND VENUE

*Subject Matter Jurisdiction*

58. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(d)(2), the Class Action Fairness Act ("CAFA"). The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

59. The proposed nationwide Class consists of more than 100 members. At least one named Plaintiff or Class member is a citizen of a different state than at least one Defendant. Members of the proposed Class include citizens of multiple states.

*Personal Jurisdiction*

60. This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), incorporating New York's long-arm statute, N.Y. C.P.L.R. Section 302(a), and because Defendants purposefully directed the challenged marketing, solicitation, and token-related business activity to New York consumers.

61. Defendants' deceptive promotional campaign was directed at consumers nationwide, including consumers in this District, through publicly accessible social media channels, official

Magic Eden and ME Foundation channels, cryptocurrency trading platforms, media appearances, and New York-facing marketing, including Magic Eden-hosted, sponsored, or attended industry events, community activations, and promotional appearances in New York. These included multiple Magic Eden-hosted promotional yacht cruises in the waters of New York Harbor, including the 2022 "Degen Yacht Party" co-hosted with the Phantom wallet during that year's NFT.NYC conference and the invitation-only April 3, 2024 "Degen Yacht Party" attended by Plaintiff Pagan.

62. Magic Eden transacted business in New York by marketing, soliciting, and servicing users in New York; operating a digital-asset marketplace accessible to New York consumers; maintaining a United States-facing domain at magiceden.us; and promoting the $ME ecosystem to New York consumers.

63. The $ME token was available for purchase on decentralized exchanges including Raydium, Jupiter, and Orca, all of which were accessible to consumers in this District during the Class Period.

64. Defendants' conduct constituted the transaction of business in New York and the commission of tortious acts causing injury to persons in New York within the meaning of C.P.L.R. Section 302(a)(1), (a)(2), and (a)(3). Plaintiffs' claims arise from or relate to those New York-directed contacts, including the New York Plaintiff's exposure to the challenged marketing and purchase of $ME while located in New York.

*Venue*

65. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b).

66. A substantial part of the events giving rise to the claims occurred here, including Defendants' New York-facing marketing and promotional activity, the deceptive conduct reaching and injuring consumers in this District, and the operation of cryptocurrency trading platforms through which New York consumers purchased or acquired $ME tokens. A substantial part of those events occurred in this District, including Magic Eden's repeated promotional yacht cruises in the waters of New York Harbor, waters within this District concurrently with the Southern District of New York, 28 U.S.C. § 112(c), including the April 3, 2024 cruise attended by Plaintiff Pagan.

## IV. FACTUAL ALLEGATIONS

### A. Defendants Sold $ME as a Use-Case-Driven Digital Product

67. Defendants did not merely sell a risky digital asset. They sold consumers the belief that $ME would become valuable because it would have multiple real use cases within a growing Magic Eden ecosystem. Those represented use cases included cross-chain trading, governance, staking rewards, revenue allocation, buybacks, trading rewards, wallet access, and platform integrations. Defendants' campaign made those use cases appear real, imminent, durable, and backed by credible operators and institutions.

68. The alleged deception is that the use cases that supposedly underlay $ME's value did not materialize as represented.

69. Magic Eden was founded in September 2021. All four founders had backgrounds at prominent technology companies including Uber, Facebook, Google, and Coinbase. Within months of launch, Magic Eden captured over 90% market share of Solana NFT trading.

70. In March 2022, Magic Eden raised $27 million in Series A funding led by Paradigm, with participation from Sequoia Capital. Three months later, it raised $130 million in Series B funding co-led by Electric Capital and Greylock at a $1.6 billion valuation, achieving unicorn status.

71. The platform's stated vision was to make digital ownership universal. The official account also signaled ambitions beyond the NFT marketplace vertical that constituted its core business.

72. The ME Foundation's August 22, 2024 press release described $ME as a community-owned and governed utility token and announced a multi-chain, anti-single-chain-maximalism thesis. The Foundation positioned itself as a non-profit steward of the ecosystem, separate from the for-profit marketplace. Here, "utility token" meant that $ME was represented as having practical use cases, real functions for which consumers or market participants would need or want the token, rather than being a purely speculative instrument.

73. The $ME token was explicitly promoted with the following represented use cases:

74. Cross-chain trading use case: $ME would work across multiple blockchain networks. If the token functioned across eight or ten chains, more users and more transactions could create demand for the token. A token useful on one blockchain is a niche product. A token useful across eight or ten blockchains is an ecosystem product with correspondingly greater demand potential.

75. Governance use case: $ME would give holders voting power over platform decisions through the ME DAO. If holders could vote on protocol development, fee structures, and partner integrations, they would have a reason to hold and lock the token to participate in governance.

76. Revenue-allocation and buyback use case: Platform revenues would be used to buy $ME tokens from the open market and to fund distributions to stakers. Revenue allocation was marketed as a central product feature that would support the $ME ecosystem and give consumers a reason to hold or stake the token.

77. Staking rewards use case: Users could lock their $ME to receive USDC revenue distributions, earn voting power, and participate in ecosystem benefits. If users could lock $ME to receive rewards, they would have a reason to hold rather than sell.

78. Trading rewards use case: Users would earn $ME through ordinary platform activity. If users earned $ME through daily trading, the token would become part of the platform's reward system and user-retention loop.

79. Wallet and airdrop use case: The Magic Eden wallet would be the secure gateway to claim and use $ME. Its security and durability were material product attributes because users were required to entrust their private credentials to this software.

80. Platform-growth use case: Magic Eden would continue expanding across chains and products. If the platform grew, the token's potential user base would expand, creating more demand for $ME.

81. The expected value increase was not detached from product use. It depended on whether the promised use cases would create real demand. A token with no equity, no contractual revenue right, and no enforceable ownership interest depends heavily on represented use cases. If those use cases are false, delayed, or abandoned, the product consumers paid for is not the product they were sold.

***B. Defendants Made the Use-Case Promises Credible Through Institutional Backing, Founder Credentials, and Official Channels***

82. Defendants created consumer demand for $ME by presenting it as a serious, use-case-driven digital product rather than a speculative token with no real function. They did this through a coordinated mix of institutional credibility, experienced leadership, official Foundation materials, exchange listings, public interviews, and specific promises that $ME would have practical uses across the Magic Eden ecosystem.

83. The institutional backing and management credentials mattered because they made the use-case promises believable. Consumers were more likely to credit promises about cross-chain functionality, governance, staking rewards, revenue allocation, and platform growth because those promises came from a well-funded company led by experienced operators and publicly associated with prominent investors.

84. The institutional backing and founder credentials amplified the materiality of the use-case promises because they made consumers more likely to believe that the promised features would be built and maintained.

85. Specifically, the $157 million in institutional funding from Paradigm, Sequoia Capital, Electric Capital, Greylock, and Lightspeed Venture Partners at a $1.6 billion valuation signaled that sophisticated institutional actors had vetted the project and committed capital to its success. These institutional credentials were cited repeatedly in public marketing materials, AMAs, and media interviews to signal legitimacy to retail participants.

86. Lu's background at FTX, Google, and Boston Consulting Group, and his early engineering experience at HelloBlock, signaled expertise in blockchain product development.

Yin's prior roles at dYdX and Coinbase, both major cryptocurrency platforms, signaled specific expertise in token design and exchange operations. Zhang's experience at Facebook and Uber signaled technical competence. Zhou's Ph.D. in Computer Science and experience at Facebook AI signaled engineering depth.

87. By the time of the $ME Token Generation Event, Magic Eden had listed the $ME token on major centralized exchanges including Binance, Coinbase, Bybit, and OKX. An exchange listing means the token was approved for trading on a major trading platform, itself a signal to consumers that the project met the exchange's listing criteria. This broad exchange presence reinforced the credibility of the use-case representations.

88. In September 2024, Magic Eden segregated U.S. users, including New York users, to a separate domain (magiceden.us). This preemptive regulatory action signaled awareness of U.S. consumer protection obligations while the company continued operating from San Francisco with U.S.-based founders and continued marketing its platform and $ME ecosystem to U.S. consumers, including consumers in New York.

89. The combined effect of institutional backing, founder credentials, exchange listings, official Foundation publications, podcast appearances, and social media campaigns was to make the represented use cases appear credible, imminent, and durable. Institutional backing and founder credentials did not stand alone; they amplified and authenticated the specific use-case promises that induced consumers to purchase, hold, stake, and lock $ME.

### C. Why the Promised Use Cases Mattered to $ME's Value

90. $ME's speculative price was a function of represented consumer use cases. Purchasers expected that if Magic Eden delivered the promised cross-chain marketplace,

governance system, staking rewards, revenue-allocation mechanics, trading rewards, and wallet access, then real users would demand $ME for actual ecosystem use. Defendants' alleged deception went to that foundational premise.

91. This mattered because consumers had no other basis to value $ME. They were not receiving stock, a contract right, or ownership in Magic Eden. They were buying a token whose value depended on whether the promised uses would create demand.

92. In ordinary terms, product features affect value. A product that works in more places, gives users more rights, and provides more benefits is worth more than a product that does not. A subscription that covers ten streaming services is worth more than one that covers two. A gym membership with pool access, personal training, and group classes is worth more than one that provides only a treadmill. The same principle applied to $ME: a token with cross-chain utility, governance rights, revenue sharing, and trading rewards was represented as a more valuable product than a token with none of those features.

93. Each use-case representation was material because it targeted the precise factor, expected user demand, on which the Token's market value depended. The multi-chain representation defined the addressable market for $ME. The governance representation gave consumers a reason to lock tokens for extended periods. The revenue-sharing representation created an expectation of tangible economic return. The trading-rewards representation promised continuous accumulation tied to platform use. The institutional-credibility representation made all other representations believable.

94. These representations were not aspirational. They were specific operational claims about concrete commercial capabilities made to consumer audiences through promotional

channels. Their materiality is established by their direct relationship to the Token's only source of value: consumer demand driven by represented use cases.

## D. The Multi-Chain Use Case and Its Collapse

95. The multi-chain use case was the core element of $ME's represented value. It told consumers that $ME would be the connective tissue across every blockchain Magic Eden supported, and that platform activity across all chains would generate demand for and accrue value to the Token. If $ME worked across multiple blockchain networks, then more users and more transactions could create demand for the token.

96. The collapse of the multi-chain strategy is independently actionable because Defendants controlled the strategic direction and knew whether cross-chain expansion was genuine or temporary.

97. Beginning in August 2022, Magic Eden announced expansion to the Ethereum blockchain, marking the first public commitment to a multi-chain strategy. The company subsequently expanded to support Polygon, Bitcoin Ordinals, Bitcoin Runes, and Abstract Chain.

98. In October 2024, forty-nine days before the Token Generation Event, Lu and Magic Eden-affiliated public channels announced a broad multi-chain growth strategy, including support for ten chains by year-end and a unified app experience for digital assets across chains.

99. The ME Foundation's tokenomics blog described $ME as broadly appealing to users across Solana, EVM, and Bitcoin. "EVM" refers to the Ethereum Virtual Machine, the software environment shared by Ethereum and many related blockchain networks. The mefoundation.com homepage listed eight supported chains as part of the platform's infrastructure.

100. In approximately November 2025, less than four months before the shutdown announcement, Magic Eden expanded to the Monad blockchain, adding yet another chain to its multi-chain portfolio. This expansion occurred shortly before the announced retrenchment from non-Solana marketplace operations.

101. On November 12, 2025, Magic Eden announced a buyback program with planned rollout to Bitcoin, Ethereum, Monad, and additional ecosystems. This representation was made 107 days before the announcement that Bitcoin and EVM marketplace operations would be terminated.

102. On January 19, 2026, Magic Eden announced that 15% of all platform revenue would be allocated to the $ME ecosystem starting February 1, 2026. This revenue-sharing commitment was made thirty-nine days before the marketplace shutdown announcement, while Plaintiffs allege the strategic pivot was imminent or under active consideration.

103. On February 27, 2026, CEO Lu announced that Magic Eden would refocus on Solana and sunset Bitcoin and EVM marketplace operations. The shutdown timeline was immediate: Bitcoin and EVM trading ceased March 9, 2026; Bitcoin API shut down March 27, 2026; the multi-chain wallet entered export-only mode on April 1, 2026 and was fully shut down on May 1, 2026.

104. Lu announced that Magic Eden was entering a new strategic phase focused on the convergence of finance and entertainment and identified Dicey, a crypto casino and sportsbook, as the company's strategic priority. He disclosed that Dicey's closed beta had approximately 200 users who had wagered over $15 million in two months.

105. The Polygon marketplace was wound down with the other EVM marketplaces following the February 27, 2026 announcement.

106. In late October 2025, Magic Eden launched its Packs feature on both Solana and Ethereum. This occurred less than four months before the announced shutdown of Ethereum marketplace operations.

107. Users who engaged with Ethereum Packs had no disclosure that the Ethereum marketplace would be shut down shortly thereafter. The decision to launch revenue-generating products on chains later slated for termination supports Plaintiffs' theory that Defendants prioritized short-term revenue extraction over transparency with consumers.

108. The shutdown announcement gave users only ten days' notice before Bitcoin and EVM trading ceased. Users who had accumulated NFTs on these chains through Magic Eden lost their primary venue for trading those assets. This constituted constructive impairment of consumer assets through platform abandonment.

109. The wallet shutdown forced users into an urgent migration process that put unsophisticated users at risk of losing funds. The wallet that users were required to adopt to claim their airdrop was being terminated within approximately seventeen months, with no alternative path provided within the Magic Eden ecosystem.

110. The Slingshot acquisition was represented as enabling bridgeless cross-chain trading, trading across blockchains without requiring separate conversion steps, and allowing users to buy and sell crypto and digital assets across chains. Slingshot was founded by Clinton Bembry Jr., previously co-founder of Astro Wallet (acquired by Coinbase). Lu announced the acquisition as an important step in advancing Magic Eden's broader vision. The later

retrenchment from cross-chain marketplace operations raises questions about whether the acquisition rationale was genuine.

*E. The Governance Use Case and Its Failure*

111. $ME was promoted as a governance token, one that would give holders voting power over the platform's future. Governance in this context means the ability for token holders to vote on proposals that affect how the platform operates and develops. This use case was a material inducement to acquire and hold the Token because it gave consumers a reason to lock their tokens for extended periods.

112. The governance use case told consumers that holding and staking $ME was equivalent to having a seat at the table, that they could influence protocol development, fee structures, and partner integrations through the ME DAO.

113. The failure to deliver governance for approximately nine months after launch is independently actionable because Defendants controlled the governance infrastructure and knew whether it was operational at the time they made governance representations.

114. The ME Foundation's tokenomics blog stated that $ME holders would have governance rights over key protocol development direction. This representation was made in November–December 2024, at and around the time of the Token launch.

115. The ME DAO Constitution, published December 16, 2024, established that tokenholders would govern the Foundation through ME Improvement Proposals across multiple governance categories. Each category specified quorum and approval thresholds.

116. Governance was designed using a vote-escrow model: users would stake $ME for a set duration to accrue voting power. Longer lock-ups generated more governance influence. This structure incentivized consumers to lock their tokens for extended periods based on the expectation that governance would be operational.

117. Governance voting was not operational for approximately nine months after the Token launched. No meaningful governance votes were conducted during that period. The DAO Constitution was formalized, but no active voting record is identifiable publicly for the first nine months post-TGE.

118. The governance system finally launched in approximately September–October 2025 with initial proposals. By that time, the Token had already declined approximately 90% from its all-time high, and the platform was developing its gambling pivot.

119. Consumers who locked their $ME tokens for extended periods in anticipation of governance participation were deprived of the governance rights they were promised during the most critical period of the Token's price formation.

120. A Security Council of five members was appointed to oversee a multi-signature wallet with the ability to perform emergency and delayed non-emergency actions. This was represented as a safeguard for the community, but the Security Council's composition, appointment process, and accountability mechanisms were not fully transparent.

### F. The Revenue-Allocation and Buyback Use Case

121. The revenue-allocation use case told consumers that platform revenues would directly support the $ME ecosystem. If platform success generated revenue that was used to buy

tokens or fund distributions, then consumers who held or staked $ME had a reason to believe that platform growth would benefit them. Revenue allocation was marketed as a central product feature that would support the $ME ecosystem and give consumers a reason to hold or stake the token.

122. If $ME was promoted at launch through staking, questing, and reward mechanics, and later through revenue-linked buybacks, but a broader revenue-sharing and USDC staking-reward mechanism was not implemented until February 2026, after Magic Eden's revenue base had declined dramatically, the representations created expectations about timing and scale that did not materialize.

123. In November 2025, Magic Eden announced that 30% of secondary marketplace revenue would be committed to buying back $ME tokens and NFTs from the open market, split 15% to $ME and 15% to NFTs.

124. The buyback program page on magiceden.us described a continuous mechanism through which marketplace fees would be used to fund NFT and token buybacks and stated that 30% of marketplace fees would be allocated to the buyback program.

125. A broader revenue-sharing and USDC staking-reward mechanism was not implemented until February 1, 2026, nearly fourteen months after the Token launched. The first monthly USDC staking reward claims were not available until March 2026, approximately fifteen months after launch.

126. When the broader revenue-sharing model was announced on January 19, 2026, the model allocated 15% of total platform revenue to the $ME ecosystem, split between buybacks and USDC distributions.

127. Magic Eden's annual revenue declined to approximately $24 million in 2025, as disclosed by CEO Lu. At the 15% allocation rate, this produced approximately $3.6 million annually flowing to the $ME ecosystem if revenue remained at that level.

128. The January 2026 revenue-sharing announcement, which should have been positive news, was followed by a further decline in the $ME token, as reported by The Defiant. The market recognized that the actual revenue scale was materially below what had been represented.

129. The buybacks page on magiceden.us returned a 404 error as of late February 2026, suggesting the page was removed in connection with the platform's strategic pivot.

130. On February 27, 2026, CEO Lu announced that Magic Eden would no longer conduct NFT buybacks as part of the strategic pivot to Solana-focused operations. This represents a reversal of the November 2025 NFT-buyback representations.

### G. Staking, Validator Rewards, and Trading Rewards

131. The ME Foundation's tokenomics blog stated that Magic Eden would unveil a broad on-chain trading rewards program where users would be able to stake, trade, and earn $ME for trading NFTs and tokens across all supported chains.

132. CEO Lu stated on or about December 15, 2024, in substance, that users would be able to earn $ME through their daily use of Magic Eden products. This framed the Token as an always-accumulating reward asset tied to normal platform behavior.

133. The MAGIC principles blog announced that Magic Eden's founders would lock their tokens until at least 18 months after TGE. This representation was designed to signal alignment

of interests between founders and retail purchasers, telling consumers that insiders had committed to the project's long-term success.

134. Lu stated in his Lightspeed podcast appearance that 2024 was Magic Eden's best year with the most users and revenue, reinforcing the growth narrative that supported $ME's valuation at launch.

135. A trading rewards program was announced as forthcoming at the Token Generation Event. Users were told in substance that they could earn $ME through ordinary Magic Eden product use. In practice, trading rewards were delivered only as limited seasonal allocations: the Season 1 rewards allocation announced in March 2025 was approximately 10 million $ME, and the August 2025 season referenced approximately 12 million $ME. These limited seasonal allocations were materially different from the continuous ordinary-use trading rewards that consumers were led to expect.

136. Staking was positioned as a prerequisite for meaningful participation in the ecosystem. Guidance available to consumers indicated that without staking, users would receive almost zero rewards even with significant trading activity. This created strong incentives for consumers to lock their tokens based on the expectation of features that had not yet been built.

137. Official materials described a self-reinforcing mechanism: more trading generates more revenue, more revenue funds more buybacks and staker rewards, more buybacks create demand for $ME, and higher token value attracts more platform activity. Magic Eden's January 19, 2026 announcement conveyed in substance that Magic Eden's success would translate into ecosystem benefits.

138. In approximately August 2025, Magic Eden announced the launch of a Solana validator in partnership with SentinelStake and announced that 100% of validator revenue would go to $ME stakers. This represented yet another yield mechanism tied to $ME staking.

139. The validator surpassed 100,000 SOL staked within 19 days of launch, demonstrating that consumers were actively committing additional capital to the $ME ecosystem based on yield representations.

140. In February 2026, Magic Eden announced that validator revenue would be used to buy back $ME for distribution to $ME stakers. Later that month, on February 27, 2026, Lu announced that Magic Eden would refocus on Solana and sunset Bitcoin and EVM marketplace operations.

141. The pattern is consistent: Defendants continued to announce new yield mechanisms, staking incentives, and token distributions throughout 2025 and early 2026 while, Plaintiffs allege, privately planning or actively considering the strategic pivot that would undermine the revenue base supporting many of these representations.

### H. The Airdrop and Wallet Gateway

142. The wallet and airdrop represented a critical use case because the wallet was the gateway through which consumers accessed $ME. When a company requires customers to use its proprietary platform to access a benefit, it has a duty to ensure that platform meets reasonable security standards and to disclose known deficiencies.

143. For $ME claimants, the wallet requirement was not optional. Users who had earned airdrop eligibility through months of platform activity could not claim their tokens without

downloading the proprietary Magic Eden wallet and either importing their private keys or linking a newly created wallet to their existing wallets, the cryptographic equivalent of handing over the master password to a bank account.

144. Unlike standard airdrops that deliver tokens to existing wallets, Magic Eden required all claimants to download the proprietary ME Wallet mobile application, link it to a desktop wallet via QR code, and maintain a minimum balance.

145. CoinDesk published an investigation on December 10, 2024, the day of the Token launch, documenting that the ME Wallet stored recovery phrases and private keys on-app with no deletion route. The wallet's non-standard architecture was flagged by security experts as a significant risk.

146. Wallet addresses generated through the ME Wallet were not importable into mainstream wallets via standard 12-word recovery phrases. This locked users into Magic Eden's proprietary infrastructure.

147. The airdrop claim process on December 10, 2024 experienced widespread technical failures. Users reported loading errors, claim failures, and tokens not credited despite on-chain confirmation of claiming transactions.

148. These technical failures impaired retail users' ability to sell at peak prices, creating asymmetric harm: users who experienced claim failures were locked out during the highest trading prices while insiders and sophisticated participants who successfully claimed could sell immediately.

149. The wallet that users were required to adopt to claim their airdrop was subsequently deprecated and shut down within approximately seventeen months of its mandated use. Users were directed to export their keys before the May 1, 2026 shutdown date.

150. The mandatory wallet download requirement was atypical. Standard airdrops deliver tokens to existing wallets without requiring users to adopt new, unvetted software. Magic Eden's requirement concentrated user data and private credentials within its proprietary infrastructure.

151. The timing of the CoinDesk investigation, published on the same day as the Token launch, meant that some users learned of the wallet's security deficiencies only after they had already imported their private keys and claimed their tokens.

152. Magic Eden acknowledged technical claim issues during the December 10, 2024 launch but did not provide remediation for users who missed peak-price selling windows due to platform failures. Because United States users were excluded from claiming the airdrop, the claim-process and wallet-import events described in this Section are alleged as evidence of Defendants' course of conduct and of the gap between the represented and actual quality of the $ME ecosystem, not as direct injuries to members of the Class, whose injuries arise from their purchases and acquisitions of $ME for value.

*I. Token Supply, Insider Allocations, and Sell-Pressure Information*

153. The tokenomics of $ME, the token's economic design, are relevant because they determine how much supply exists, who holds it, when it can be sold, and what mechanisms may support demand. If nearly 50% of token supply is reserved for insiders with lockup periods that create foreseeable future sell-pressure events, sell pressure meaning the practical risk that large

holders may sell and push down the price, consumers need that information prominently disclosed to assess whether the market they are entering is fair.

154. The $ME token had a total supply of 1,000,000,000 tokens distributed over four years. At the Token Generation Event, only 12.5% of supply (125 million tokens) was released to the public through the airdrop.

155. The stated allocation, as updated in January 2025, reserved 25.5% of supply for contributors (team, contractors, advisors), with core contributors representing more than 60% of that allocation locked for a minimum of 18 months post-TGE and all contributors locked for a minimum of 12 months, and 23.6% for strategic participants (investors) with a minimum 12-month lockup. Combined, nearly 50% of total supply was reserved for insiders.

156. While the ME Foundation published a transparency report and tokenomics documentation, the practical effect of the allocation structure was that insider lockups began expiring in December 2025 (strategic participants), with the core-contributor tranche, more than 60% of the contributor allocation, unlocking on or about June 10, 2026, creating foreseeable sell-pressure events that were not prominently disclosed to retail purchasers.

157. The initial airdrop was valued at approximately $700 million at launch-day prices. By March 2026, the same 125 million tokens were worth approximately $15 million, a decline of approximately 98% from the launch-day airdrop valuation.

158. The airdrop eligibility criteria were criticized as opaque, with no transparent methodology for determining organic users and no published appeals process. Users who had traded actively on the platform for months received varying allocations without clear explanation.

159. U.S. users were explicitly excluded from claiming the $ME airdrop. The full scope of jurisdictional restrictions and their impact on token use cases was not prominently disclosed before users engaged in eligibility-earning activity on the platform.

160. Unclaimed airdrop tokens were stated to be returned to $ME stakers as future rewards. This created an additional staking incentive based on the expectation of ongoing token distributions that would require sustained platform operations.

*J. The Pattern: Representation, Reliance, Non-Delivery, and Harm*

161. This Complaint does not rest on any single misstatement. The alleged deception was a course of conduct, a series of economically coherent acts designed to create and preserve the impression that $ME was a use-case-driven, governance-empowered, revenue-sharing token tied to a growing multi-chain platform.

162. The pattern of representation followed by non-delivery can be summarized across seven use-case categories, each of which independently supports the claims asserted herein.

163. Multi-chain expansion was represented as the core platform strategy. Magic Eden and affiliated leadership/public channels announced a ten-chain and all-assets, all-chains strategy. The consumer meaning was clear: $ME would accrue value from trading activity across every supported blockchain. Magic Eden expanded to Monad as late as November 2025, then announced on February 27, 2026 that it would refocus on Solana and sunset Bitcoin and EVM marketplace operations. The multi-chain wallet was shut down. The Polygon marketplace was wound down with the other EVM marketplaces. Consumers bought into a cross-chain growth story that was reversed in material part.

164. Governance through the ME DAO was represented as giving stakers voting power over protocol development and key platform directions. Consumers locked tokens for extended periods based on this promise. Governance was not operational for approximately nine months after launch. When finally activated, it governed a platform that soon announced a retrenchment from its multi-chain marketplace strategy and a pivot toward gambling. The governance rights that consumers purchased were hollow.

165. Revenue sharing was represented through a November 2025 commitment to direct 30% of secondary marketplace revenue to buybacks (15% to $ME and 15% to NFTs) and a January 2026 allocation of 15% of revenue to the $ME ecosystem. Consumers expected meaningful yield from platform activity. A broader revenue-sharing and USDC staking-reward mechanism was not implemented until nearly fourteen months post-launch; the disclosed 2025 revenue base implied approximately $3.6 million per year if revenue held. Within weeks, however, Magic Eden announced the shutdown of Bitcoin and EVM marketplace operations and discontinued NFT buybacks, materially narrowing the revenue base and ecosystem-support mechanism.

166. The ME Wallet was represented as a secure, user-friendly gateway to the $ME ecosystem. Non-U.S. claimants were required to use the wallet to claim their airdrop. CoinDesk documented security deficiencies including non-deletable private key storage. The wallet was deprecated and shut down within approximately seventeen months. Users who imported credentials were exposed to risks that were not disclosed.

167. A trading rewards program was represented as a continuous earn mechanism for active traders. The program was not launched in the form represented at TGE.

168. The Slingshot acquisition was represented as enabling bridgeless cross-chain trading across chains. The representation was undermined when Magic Eden later retrenched from Bitcoin and EVM marketplace operations and consolidated its Magic Eden marketplace strategy around Solana.

169. The cumulative effect of these categories of representation followed by non-delivery is a comprehensive failure of the use-case proposition that consumers relied upon when they purchased $ME. No single representation can be isolated as merely aspirational when the entire pattern demonstrates systematic overstatement of use-case capabilities.

170. The following chart summarizes the principal material representations identified to date.

| Category | Speaker | Source | Representation | Use Case Affected | Outcome |
|---|---|---|---|---|---|
| Multi-chain | Lu | X / Blog (Oct 2024) | Ten-chain support and unified all-assets/all-chains app | Cross-chain trading | Bitcoin/EVM marketplaces sunset; wallet shut down; Solana refocus |
| Governance | Foundation | Tokenomics blog (Nov 2024) | Governance rights over protocol development | Governance voting | No governance for ~9 months |

| Category | Speaker | Source | Representation | Use Case Affected | Outcome |
|---|---|---|---|---|---|
| Buybacks | Foundation | Buyback page / Blog | 30% of secondary marketplace revenue to $ME/NFT buybacks | Revenue allocation | NFT buybacks later discontinued; broader revenue-share model changed |
| Revenue share | Lu | X (Jan 2026) | 15% of revenue to $ME ecosystem | Staking rewards | $24M revenue base → approximately $3.6M/year if revenue held |
| Trading rewards | Lu / Foundation | TGE announcement | Earn $ME through ordinary Magic Eden product use | Trading rewards | No live program as represented |
| Wallet security | Magic Eden | ME Wallet launch | Secure wallet for airdrop claims | Wallet access | Private-key / recovery-phrase concerns later reported |
| Institutional | All | PR / Media | $157M raised; $1.6B valuation | Credibility amplifier | Pivoted to Dicey; 98% decline |
| Lock-up | Foundation | Tokenomics blog | Founder/core-contributor lockups | Insider alignment | Core-contributor unlock on/about June 10, 2026 |

171. Defendants leveraged institutional credibility from Paradigm, Sequoia, and other venture investors to authenticate the project. They announced multi-chain expansion to Bitcoin, Ethereum, Polygon, Abstract, and Monad while later developing a gambling-focused strategic

pivot. They promised governance that was not operational for approximately nine months. They announced revenue-linked buyback and staking-reward programs that were later altered, narrowed, or discontinued in material part. They required non-U.S. claimants to adopt a proprietary wallet with documented security deficiencies. They continued making forward-looking commitments while the strategic pivot was imminent or under active consideration.

172. Each act served the same economic purpose: increasing or preserving $ME's perceived value by reinforcing the represented use cases. Together, they supported the market price and induced consumers to buy, stake, and hold.

173. The post-collapse conduct reinforces the inference of a unified course of conduct. Rather than acknowledging the scale of the Token's decline or its causes, CEO Lu maintained positive framing. The delayed broader revenue-sharing announcement in January 2026 was made without acknowledging that a broader revenue-sharing and USDC staking-reward mechanism had not been operationally implemented for nearly fourteen months. The quiet removal of the buybacks dashboard page further demonstrates a pattern of removing failed use-case promises without public accountability.

174. On March 18, 2026, Binance announced that it would delist the ME/FDUSD trading pair effective March 20, 2026, as part of its periodic review of spot trading pairs, a review under which pairs with deteriorating liquidity and trading volume are removed. This delisting from one of the world's largest exchanges was a market-level consequence of the Token's collapse and a further injury to consumers who held $ME.

**K. Causation, Consumer Harm, and Defendants' Knowledge**

175. Consumers are harmed when they purchase a product at prices inflated by material misrepresentations about the product's use cases, and when the truth is revealed through corrective disclosure or market events.

176. $ME's price incorporated the market's assessment of the represented use cases, multi-chain functionality, governance rights, revenue sharing, trading rewards, institutional backing, and platform growth. When those use cases failed to materialize, the price collapsed.

177. For purchasers, the harm was threefold. They overpaid at the point of purchase. They held when they otherwise would have sold because continuing representations induced them to maintain their positions. And they conferred economic benefits on Defendants who failed to deliver the represented product.

178. The harm alleged in this Complaint is not mere disappointment that a speculative asset declined. It is overpayment and holding-period injury caused by material misrepresentations about the use cases that were supposed to give $ME its value.

179. $ME reached an all-time high of approximately $5.63 on December 11, 2024, excluding a brief launch-day price spike on thin liquidity. That valuation incorporated the market's assessment of every represented use case.

180. Price-Premium/Overpayment Damages. Consumers paid more for $ME than they would have paid absent those representations. The difference between the price paid and the price that would have prevailed in a market informed by accurate information about the Token's actual use cases constitutes the price-premium injury.

181. Holding/Staking/Lock-Up Damages. Representations about multi-chain expansion, governance activation, forthcoming revenue sharing, and the Monad expansion all encouraged holders to maintain their positions during a period of continuous price decline. Consumers who locked tokens for extended staking periods based on these use-case commitments were induced to do so under false pretenses.

182. Restitutionary/Unjust-Enrichment Damages. Defendants and affiliated entities benefited from consumer participation. The founders hold equity stakes in a company valued at $1.6 billion. The founders and core contributors hold allocations within the 25.5% of $ME supply reserved for contributors. Strategic participants, including Paradigm, Sequoia, and other institutional investors, received 23.6% of total $ME supply. The Token launch created liquidity, meaning the practical ability to sell what were previously illiquid venture positions, for these insiders.

183. The Token declined approximately 98% from its all-time high, from approximately $5.63 to approximately $0.12.

184. Lu, Yin, Zhang, and Zhou had superior knowledge about every material fact at issue. They controlled the strategic direction of the platform. They knew whether multi-chain expansion was genuine or temporary. They knew the revenue trajectory. They knew whether governance was operational.

185. They designed the wallet and knew its security architecture. They controlled the insider allocation and vesting schedules. Consumers, by contrast, could not independently verify any of these facts.

186. The informational asymmetry was profound and structural. Defendants controlled the information that determined whether the represented use cases would create demand for consumers' tokens, and they chose what to disclose and what to withhold.

187. The nearly fourteen-month gap between the Token Generation Event and the first implementation of a broader revenue-sharing and USDC staking-reward mechanism suggests the mechanism was not built at the time $ME was promoted as a rewards- and staking-driven ecosystem token.

188. The continued assurances by CEO Lu after the Token had already begun its collapse, without acknowledging non-delivery of represented use cases, support the inference that the promotional representations were designed to maintain retail demand while insiders awaited lockup expiration.

189. The June 10, 2026 expiration of the 18-month insider lockup period for core contributors created, and continues to create, foreseeable additional sell pressure as insiders became free to liquidate their 25.5% allocation into an already devastated market.

**V. CLASS ALLEGATIONS**

190. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following nationwide Class:

*All persons and entities in the United States who purchased or otherwise acquired $ME tokens for value during the period from December 10, 2024 through the date of the filing of this Complaint (the "Class Period") (the "Class").*

191. Excluded from the Class are Defendants and their officers, directors, agents, employees, and immediate family members, as well as any entity in which any Defendant has a controlling interest.

192. Also excluded are institutional market makers who acted in that capacity, persons bound by enforceable arbitration agreements with Defendants covering these claims, and any judge assigned to this action.

193. Plaintiffs reserve the right to amend the Class definition based on information obtained in discovery.

***Numerosity, Commonality, Typicality, and Adequacy***

194. The Class is so numerous that joinder of all members is impracticable. The $ME token was listed on numerous major exchanges. On-chain data reflects numerous unique wallet addresses that held or traded $ME during the Class Period.

195. Common questions of law and fact predominate, including whether Defendants engaged in deceptive acts or practices in violation of GBL Section 349, whether Defendants' representations about the Token's use cases were materially misleading, whether New York law applies on a classwide basis to Defendants' uniform nationwide course of conduct, whether Defendants were unjustly enriched, and the proper measure of damages.

196. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members purchased or otherwise acquired the same Token for value, were exposed to or purchased in a market affected by the same standardized public representations about the Token's use cases, and suffered the same types of economic injury.

197. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests of the Class. Plaintiffs have retained counsel experienced in class action litigation and consumer protection matters.

***Predominance and Superiority***

198. Common questions of law and fact predominate over individual Class members' questions. The core use-case representations were public, standardized, and supplied the market with the same description of $ME's represented use cases. Defendants' representations were made uniformly through public channels and as part of a centrally orchestrated nationwide marketing campaign that was repeatedly directed to New York consumers and markets. The Token mechanics and promotional campaign affected all purchasers.

199. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the large number of Class members makes individual joinder impracticable and individual damages for many Class members may be relatively small.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349

*(Against All Defendants, on Behalf of the Class)*

200. Plaintiffs repeat and re-allege each allegation set forth above as if fully set forth herein.

201. New York General Business Law Section 349, as amended, declares that "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

202. Defendants engaged in consumer-oriented deceptive practices by marketing $ME as a use-case-driven digital product tied to a multi-chain platform while omitting material facts about the limitations, delays, and ultimate abandonment of its represented use cases.

203. Defendant Lu personally made or amplified core representations about multi-chain expansion, token use cases, and platform growth. He and affiliated public channels announced ten-chain support, appeared on podcasts and social media to promote the multi-chain narrative, and on February 27, 2026, he personally announced the retrenchment from Bitcoin and EVM marketplace operations and the refocus on Solana.

204. Defendant Yin made product announcements and cross-chain strategy updates that reinforced the multi-chain and use-case narrative. His prior experience at dYdX and Coinbase gave him specific knowledge that the governance and revenue-sharing mechanisms were not operational at the time they were represented.

205. Defendant Zhang was responsible for the wallet's technical architecture and knew of the security deficiencies documented by CoinDesk. His technical authority encompassed the systems consumers were required to use to claim their airdrop.

206. Defendant Zhou made technical decisions regarding token infrastructure and smart contract deployment directly relevant to whether the represented use cases could be delivered as promised.

207. Defendant Magic Eden operated the marketplace, controlled the revenue streams, and hosted the promotional materials that communicated the misleading use-case representations to consumers.

208. Defendant ME Foundation issued the Token, set the tokenomics, and published the official representations about $ME's use cases. The Foundation controlled the airdrop claim portal and the governance infrastructure that was not operational for approximately nine months.

209. Defendants' deceptive conduct was consumer-oriented. The Token was marketed and sold to consumers through social media, official blogs, podcast appearances, cryptocurrency media, and trading platforms accessible to the general public.

210. Defendants' deceptive acts were material. $ME holders had no equity, revenue rights, or enforceable contractual claims. The Token's value depended on expected demand driven by represented use cases, and Defendants' representations targeted the precise use cases that determined that demand.

211. As a direct and proximate result of Defendants' deceptive acts, Plaintiffs and the Class suffered overpayment and inflated-price injury. They acquired $ME at prices inflated by the use-case narrative and held when they otherwise would have sold.

212. Defendants' violations were willful and knowing. The four co-founders controlled the platform's strategic direction, designed the tokenomics, and personally made or amplified the core representations at issue. CEO Lu announced support for ten chains and later announced a contrary Solana-focused retrenchment.

213. Pursuant to N.Y. GBL Section 349(h), Plaintiffs seek actual damages or fifty dollars, whichever is greater, treble damages up to one thousand dollars upon a showing of willful or knowing violation, reasonable attorney's fees, and injunctive relief.

**SECOND CLAIM FOR RELIEF**

**FALSE ADVERTISING IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 350**

*(Against All Defendants, on Behalf of the Class)*

214. Plaintiffs repeat and re-allege each allegation set forth above as if fully set forth herein.

215. New York General Business Law Section 350 declares that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

216. Defendants engaged in false advertising by disseminating specific, materially misleading statements about $ME's use cases through X, the @MEFndn account, the @MagicEden account, the @0xLeoInRio account, the ME Foundation blog, Magic Eden community blog, podcast interviews, and cryptocurrency media outlets.

217. Those statements included representations in substance that: Magic Eden would support ten blockchains by year-end; $ME holders would have governance rights over key protocol development direction; 30% of marketplace revenue or fees would be directed to $ME and NFT buybacks; and users would be able to earn $ME through ordinary use of Magic Eden products.

218. These were not vague aspirational statements or puffery. They were specific operational claims about concrete use cases made to consumer audiences through promotional channels. They were misleading in a material respect and had the capacity to deceive consumers.

219. Plaintiffs and the Class acquired tokens at artificially inflated prices in reliance on these use-case representations.

220. Pursuant to N.Y. GBL Section 350-e(3), Plaintiffs seek actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

*(Against All Defendants, on Behalf of the Class)*

221. Plaintiffs repeat and re-allege each allegation set forth above as if fully set forth herein.

222. Defendants made representations of material fact concerning the use cases, governance, revenue sharing, multi-chain expansion, and prospects of $ME as described above.

223. Defendants had a duty to provide correct information because they were uniquely positioned to know whether the represented use cases were operational, the revenue trajectory, the strategic direction, and the security architecture of their own platform.

224. The four co-founders controlled every aspect of Magic Eden's operations. Lu set the strategic direction. Yin managed the product. Zhang built the technical infrastructure. Zhou engineered the platform. They collectively knew the status of every represented use case.

225. Yin's prior experience at dYdX and Coinbase gave him specific expertise in token launch mechanics. Lu's prior experience at FTX gave him direct knowledge of exchange operations and token economics. These were sophisticated operators who understood the significance and reach of the representations they made about $ME's use cases.

226. Defendants made these representations without reasonable grounds for believing the use cases could be delivered as represented, or with knowledge that they were incomplete or misleading.

227. Having chosen to speak about $ME's use cases and features, Defendants were required to speak accurately and completely about matters uniquely within their knowledge.

228. Plaintiffs and the Class justifiably relied upon Defendants' representations. The statements concerned information to which only Defendants had access. Consumers could not inspect the platform's internal build status, revenue figures, or strategic plans.

229. As a direct and proximate result, Plaintiffs and the Class suffered financial losses in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

*(Against All Defendants, on Behalf of the Class)*

230. Plaintiffs re-allege and incorporate by reference each allegation set forth above. This claim is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

231. Defendants have been unjustly enriched at the expense of Plaintiffs and the Class. The $ME promotional campaign generated consumer demand, market liquidity, brand attention, and commercial opportunities that Defendants captured.

232. The four co-founders received equity stakes in a company valued at $1.6 billion and token allocations within the 25.5% of $ME supply reserved for core contributors.

233. Strategic participants, including Paradigm, Sequoia Capital, Electric Capital, Greylock, and Lightspeed, received 23.6% of total $ME supply. The Token launch created secondary market liquidity for positions that were previously illiquid venture investments.

234. Magic Eden received increased brand recognition, platform adoption, trading activity, and commercial value from the $ME promotional campaign. The global airdrop claim process drove adoption of Magic Eden's mobile application and concentrated user data within the company's infrastructure.

235. The ME Foundation received control over the token issuance and governance apparatus. The airdrop claim process generated wallet connections and user relationships.

236. Plaintiffs and the Class conferred these benefits by purchasing $ME tokens for value. Their capital and participation directly funded the market liquidity, platform adoption, and commercial ecosystem from which Defendants profited.

237. Consumers did not receive the durable use cases, governance, revenue sharing, or multi-chain ecosystem they were led to expect. The promised use cases were delayed, diminished, abandoned, or never delivered as represented.

238. Retention of benefits obtained through misleading promotion of use cases would be inequitable and unconscionable.

239. Plaintiffs seek restitution and disgorgement of all revenues, profits, and benefits wrongfully obtained, in an amount to be determined at trial.

## VII. PRAYER FOR RELIEF

240. WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court enter judgment against Defendants, jointly and severally, and grant the following relief:

(a) An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), designating Plaintiffs as Class Representatives, and designating Plaintiffs' counsel as Class Counsel;

(b) An order directing that reasonable notice be given to Class members pursuant to Fed. R. Civ. P. 23(c)(2)(B);

(c) Price-Premium/Overpayment Damages: An award of actual damages to Plaintiffs and the Class, including the difference between the price paid and the actual value of the tokens at the time of purchase absent Defendants' use-case misrepresentations, in an amount to be proven at trial;

(d) Holding/Staking/Lock-Up Damages: An award of damages to Plaintiffs and the Class for losses sustained by holding, staking, or locking $ME tokens in reliance on continuing representations about use cases that were delayed, diminished, or abandoned, in an amount to be proven at trial;

(e) Restitutionary/Unjust-Enrichment Damages: Restitution of money or property wrongfully obtained from Plaintiffs and the Class, including traceable proceeds received by Defendants through the unlawful conduct alleged herein, in amounts to be proven at trial;

(f) An award of damages pursuant to N.Y. GBL Section 349(h), including actual damages or fifty dollars, whichever is greater, with discretionary trebling up to one thousand dollars upon a finding of willful or knowing violation;

(g) An award of damages pursuant to N.Y. GBL Section 350-e(3), including actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney's fees;

(h) An award of compensatory damages for all losses proximately caused by Defendants' negligent misrepresentations, in an amount to be proven at trial;

(i) A preliminary and permanent injunction restraining Defendants from transferring, dissipating, encumbering, or otherwise disposing of specifically identifiable, traceable assets derived from the conduct described herein;

(j) An award of reasonable attorney's fees and costs pursuant to N.Y. GBL Section 349(h) and as otherwise permitted by law;

(k) An award of prejudgment interest at the statutory rate from the date of each wrongful act through the date of judgment; and

(l) Such other and further relief as this Court deems just, proper, and equitable.

## VIII. JURY DEMAND

241. Plaintiffs, on behalf of themselves and all Class members, hereby demand a trial by jury on all issues so triable.

Dated: June 16, 2026

New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

By: /s/ Max Burwick

Max Burwick, Esq.
43 West 43rd Street, Suite 114
New York, NY 10036
Tel: (646) 762-1080
max@burwick.law

*Counsel for Plaintiffs and the Proposed Class*